1
2
3
4
5
6
7
8
9      UNITED STATES DISTRICT COURT

10     SOUTHERN DISTRICT OF CALIFORNIA

11

12  | ESCONDIDO UNION HIGH SCHOOL DISTRICT, | Case No.: 24-cv-1653-RSH-JLB

13

Plaintiff,   **ORDER REMANDING DECISION OF ADMINISTRATIVE LAW JUDGE**

14

15     v.                                   [ECF No. 25]

16     TONY ALOY and ASHLEY WENDEL, parents on behalf of C.A., a minor student,

17                                    Defendant.

18

19

20        Plaintiff Escondido Union High School District (the "District") brings this action

21  under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. §

22  1415(i)(2)(A). The District appeals a June 18, 2024 final administrative decision (the

23  "ALJ's Decision") that held that the District had denied C.A., a minor student, a free

24  appropriate public education ("FAPE"). Administrative Record ("AR") 1512–13.[1]

25  _____

26

27  [1]      All citations to the AR refer to the page numbers in the bottom right-hand corner of
    the AR, filed as ECF No. 17.

28

In the instant action, the District alleges several errors by the ALJ; Defendants Tony Aloy and Ashley Wendel, the parents of C.A. ("Parents"),[2] request that the Court affirm the ALJ's Decision. Pursuant to Local Civil Rule 7.1(d)(1), the Court finds the motion presented appropriate for resolution without oral argument.[3] For the reasons below, the Court **VACATES** the ALJ's decision and **REMANDS** this action for further proceedings consistent with this Order.

## I.    BACKGROUND

### A.    Statutory Background

Congress enacted the IDEA to ensure "all children with disabilities have available to them a free appropriate public education"—also called a FAPE—"that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). The IDEA imposes a "least restrictive environment" requirement, under which states must ensure that "children with disabilities . . . are educated with children who are not disabled" and that "removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A).

To this end, the IDEA requires that students "receive a FAPE through the development of an individualized education program." *McIntyre v. Eugene Sch. Dist. 4J*, 976 F.3d 902, 910 (9th Cir. 2020). The individualized education program ("IEP") is "the centerpiece of the statute's education delivery system for disabled children." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 391 (2017) (citation

---

[2]    C.A's mother, Defendant Ms. Wendel, is referred to as "Parent" throughout this Order.

[3]    The IDEA provides the court "shall hear additional evidence at the request of a party," *see* 20 U.S.C. § 1415(e)(2), but here neither party has requested an evidentiary hearing.

omitted). Every IEP must include statements about "the child's present levels of academic achievement," "measurable annual goals," and an explanation of "the extent, if any, to which the child will not participate with nondisabled children in the regular class . . . ." 20 U.S.C. § 1414(d)(1)(A).

An "IEP Team" composed of parents, teachers, educational agency representatives, and experts develops the IEP. 20 U.S.C. § 1414(d)(1)(B). When parents and educators disagree about a child's IEP, the IDEA provides for informal dispute resolution procedures and mediation. *Id.* §§ 1415(e), (f)(1)(B)(i). If these measures fail, the aggrieved party is entitled to a "due process hearing" before the State or local educational agency. 20 U.S.C. § 1415(f).

Under 34 C.F.R. § 300.502(b)(2) and California Education Code § 56327(c), a parent has the right to request an independent educational evaluation ("IEE") at public expense if the parent disagrees with an evaluation obtained by the district. If a district denies a parent's request for an IEE, the district must file a due process complaint to request a hearing on the appropriateness of its evaluation.[4] 34 C.F.R. § 300.502(b)(2); Cal. Educ. Code § 56327(c). "[A]t the conclusion of the administrative process, the losing party may seek redress in state or federal court." *Endrew*, 580 U.S. at 392.

## B. Factual Background

At the time of the hearing before the ALJ in April 2024, C.A. was sixteen years old and qualified for special education and related services under the IDEA. ECF Nos. 25 at 2; 28 at 1. C.A. had attended the Winston School ("Winston"), a nonpublic school in San Diego, CA, since April 2022. AR 1472.

---

[4]    A party will "file for due process" to request a due process hearing. At this hearing, "all parties may be accompanied by counsel, and may present evidence and confront, cross-examine, and compel the attendance of witnesses." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 54 (2005); 20 U.S.C. § 1415(h)(1)-(2).

### 1.    *Settlement Agreement and Placement at Private School*

In November 2022, Parents and the District executed a settlement agreement related to C.A.'s education for the 2022–2023 school year. AR 261. As part of the settlement agreement, the District agreed to fund tuition and related services and provide transportation to and from Winston during the 2022–2023 school year; assess C.A. in all areas of suspected disability; convene an IEP meeting prior to the end of the 2022–2023 school year to develop an IEP for the 2023–2024 school year; and fund attorneys' fees and costs up to a designated amount. *Id.* Parents agreed to waive all educational claims through the conclusion of the 2022–2023 school year. *Id.*

### 2.    *Assessment*

In March 2023, in accordance with the settlement agreement, the District developed a plan to assess C.A. in various areas. ECF Nos. 1 ¶ 25; 28 at 4. District school psychologist Willow Ray and District speech and language pathologist Melissa McNutt-Eidson conducted C.A.'s assessments. ECF No. 28 at 4.

On May 11, 2023, Parent completed a social-emotional questionnaire provided by Ms. Ray. *Id*. On May 25, 2023, Ms. Ray completed C.A.'s psychoeducational and educationally related mental health services ("ERMHS") assessment report. ECF No. 28 at 4. She administered assessments to evaluate C.A.'s eligibility for special education based on cognitive and processing abilities, academics, autism and adaptive behavior needs, and social-emotional and behavioral needs. ECF No. 25 at 3. Ms. Ray concluded that C.A. met continued eligibility criteria for special education under the category of Other Health Impairment ("OHI") due to attention-deficit/hyperactivity disorder ("ADHD") and anxiety, and that C.A. did not meet eligibility criteria for special education under the categories of emotional disturbance, specific learning disability, or autism. ECF No. 1 ¶ 37.

On April 27, 2023, Ms. McNutt-Eidson sent Parent two forms to fill out—a Parent Checklist for Speech and Language Skills and a Pragmatics Language Checklist—to help

direct assessments of C.A. ECF No. 1 ¶ 27. Parent did not return the Pragmatics Language Checklist to Ms. McNutt-Eidson, but did return the Parent Checklist for Speech and Language Skills on May 17, 2023. ECF No. 25 at 8–9. On May 30, 2023, Ms. McNutt-Eidson completed C.A.'s speech and language assessment report. *Id* at 11. Ms. McNutt-Eidson concluded that C.A. did not meet eligibility under speech or language impairment categories. *Id.*

### 3.    *Continued Education at Private School*

In May and June 2023, the District proposed several dates to Parents for when to convene for an IEP meeting. ECF No. 1 ¶ 45. Parents were unavailable to meet on any of the proposed dates. *Id.* On June 7, 2023, the District issued a prior written notice ("PWN") summarizing its efforts to schedule an IEP meeting, proposing dates in August for a rescheduled meeting, and informing Parents that in the interim, C.A. could receive services at a District public school. ECF No. 25 at 6.

Instead, on August 15, 2023, Parents sent the District an email stating their intent to maintain C.A. at Winston until they received a formal FAPE offer at an IEP meeting. AR 452. They also requested that the District reimburse them for C.A.'s placement at Winston starting August 28, 2023. *Id*.

### 4.    *Denial of Request for Tuition/Denial of Request for IEEs*

On August 18, 2023, the District sent Parents a second PWN denying their request for tuition reimbursement for the 2023–2024 school year at Winston. *Id.* The Parties convened for IEP meetings on August 25, 30, and September 6, 2025, after school had already begun, to review the assessments and develop a FAPE offer for C.A. ECF Nos. 28 at 4; 1 ¶ 47. At the IEP meetings, Parent raised concerns about the assessment results and report. ECF No. 28 at 4.

On September 12, 2023, the District emailed Parent a finalized version of C.A.'s IEP. AR 1256–88. Between September 14 and October 5, 2023, the District sent Parent final versions of C.A.'s assessment reports. *Id.* at 1290–1352. On November 8, 2023,

1    Parents emailed the District, disagreeing with the District's psychoeducational and speech
2    and language assessments, and requesting that the District fund IEEs in those areas. *Id*. at
3    1354. Parents stated they had already selected a psychologist, Dr. Jill Weckerly, to perform
4    the psychoeducational assessment. *Id*. On November 14, 2023, the District sent Parents a
5    prior written notice denying their request for IEEs. *Id*. at 1355.

6         **C.    Underlying Proceedings**

7         On November 29, 2023, the District filed a complaint with the Office of
8    Administrative Hearings ("OAH") seeking a determination that its psychoeducational and
9    speech and language assessments were legally appropriate ("District's Issue 1" and
10   "District's Issue 2"), and that Parents were therefore not entitled to IEEs. AR 1355–56.

11        On February 20, 2024, Parents filed a complaint with OAH, alleging the District
12   denied C.A. a FAPE by failing to: assess her for autism and consider its impact when
13   developing her educational program ("Student's Issue 1" and "Student's Issue 3"); conduct
14   a comprehensive psychoeducational assessment ("Student's Issue 2"); adequately assess
15   her speech and language needs ("Student's Issue 4"); address her social-emotional and
16   mental health needs ("Student's Issue 5"); and offer an appropriate placement ("Student's
17   Issue 6"). AR 84–91. Parents sought funding from the District for psychoeducational and
18   speech and language IEEs, placement at Winston, and transportation to and from Winston.
19   AR 89.

20        In April 2024, the OAH held a due process hearing. AR 1469. On June 18, 2024, the
21   ALJ issued a decision ruling in favor of the Parents on all eight issues. AR 1512–13.
22   Regarding the District's Issues, the ALJ determined that: (1) the District's
23   psychoeducational assessment was not legally sufficient and that Parents were entitled to
24   an IEE at public expense; and (2) the District's speech and language assessment was not
25   legally sufficient and Parents were entitled to an IEE at public expense. AR 1512–13.

26        With respect to the Student's Issues, the ALJ determined that: (1) the District had
27   denied C.A. a FAPE when it failed to assess C.A. for autism from March 3, 2023 through
28

February 20, 2024 and by failing to consider autism when designing C.A.'s educational program; (2) the District's psychoeducational assessment failed to comply with the requirements of 34 CFR § 300.304 by not being sufficiently comprehensive to identify all of C.A.'s educational needs and by not utilizing assessment tools and strategies to produce relevant information; (3) the District's speech and language assessment was not legally sufficient as it was not sufficiently comprehensive to identify all of C.A.'s speech and language needs and did not utilize assessment tools and strategies to produce relevant information; (4) the District denied C.A. a FAPE for the 2023–2024 school year by failing to consider and adequately address C.A.'s social emotional and mental health needs; and (5) the District denied C.A. a FAPE for the 2023–2024 school year by failing to offer C.A. an appropriate placement in a small, structured setting such as Winston. AR 1513.

The ALJ ordered the District to reimburse Parents for the partial payment Parents already made for the 2023–24 school year; to pay the balance of tuition for the 2023–2024 school year at Winston; to reimburse parents for mileage expenses for each day of attendance at Winston for the 2023–2024 school year; to reimburse Parents for the psychoeducational IEE by Dr. Weckerly; to fund a speech and language IEE; to fund C.A.'s registration, tuition, and transportation to Winston through the end of the first semester of the 2024–25 school year; and to hold IEP meetings during the first semester of the 2024–2025 school year to review Dr. Weckerly's psychoeducational IEE results, review the forthcoming speech and language IEE results, and to make an offer of placement, services, and supports that would provide C.A. with a FAPE to begin on January 1, 2025. AR 1517–18.

### D.    Procedural Background

On September 9, 2024, the District filed the instant action against Parents under the IDEA. *See* ECF No. 1. On January 17, 2025, Parents filed an Answer. ECF No. 8. On February 13, 2025, the AR was filed under seal. ECF No. 17. On February 17, 2025, Parents filed a motion to supplement the AR with documents concerning events that

occurred after the administrative hearing. ECF No. 18. The District filed an opposition to Parents' motion. ECF No. 19. On March 31, 2025, the Court denied Parents' motion to supplement the AR. ECF No. 20.

On May 29, 2025, June 19, 2025, and July 15, 2025, the Parties filed their merits briefs for the instant motion. ECF Nos. 25, 28, 29. The matter is fully briefed.

## II.    STANDARD OF REVIEW

Under the IDEA, any "party aggrieved by the findings and decision" reached through the state administrative hearing process "shall have the right to bring a civil action with respect to the complaint . . . in a district court of the United States[.]" 20 U.S.C. § 1415(i)(2). The IDEA instructs a reviewing court to "receive the records of the administrative proceedings" and "basing its decision on the preponderance of the evidence, [to] grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2). "Thus, judicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993).

In IDEA cases, "the district court essentially conduct[s] a bench trial based on a stipulated record." *Ojai*, 4 F.3d at 1472. Thus, the reviewing court will "read the administrative record, consider the new evidence, and make an independent judgment based on a preponderance of evidence and giving due weight to the hearing officer's determinations." *Capistrano Unified Sch. Dist. v. Wartenberg By & Through Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995). The moving party bears the burden of proving that the ALJ's decision was incorrect by a preponderance of the evidence. *J.B. v. Kyrene Elem. Sch. Dist. No. 28*, 112 F.4th 1156, 1161 (9th Cir. 2024).

A court's inquiry in suits under § 1415(e)(2) is twofold. First, the court assesses "whether the IDEA's procedures were complied with and second whether the district met its substantive obligation to provide a FAPE." *Los Angeles Unified Sch. Dist. v. A.O. by &*

1  *through Owens*, 92 F.4th 1159, 1169 (9th Cir. 2024) (quoting *Crofts v. Issaquah School*

2  *Dist. No. 411*, 22 F.4th 1048, 1054 (9th Cir. 2022)). "Not all procedural violations amount

3  to a denial of FAPE." *J.B.*, 112 F.4th at 1160 (citation omitted). A procedural error can be

4  "harmless," *A.O.*, 92 F.4th at 1169, but it amounts to a denial of FAPE if it "results in the

5  loss of an educational opportunity, seriously infringes the parents' opportunity to

6  participate in the IEP formulation process or causes a deprivation of educational benefits."

7  *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 953 (9th Cir. 2010); *Amanda J. v. Clark*

8  *County Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001). Mere technical violations will not

9  render an IEP invalid. *Mercer Island Sch. Dist.*, 592 F.3d at 953; *Amanda J.*, 267 F.3d at

10  892.

11      A school district violates the IDEA's substantive requirements when it fails to offer

12  an IEP that is "reasonably calculated to enable a child to make progress appropriate in light

13  of the child's circumstances." *Endrew*, 580 U.S. at 403; *A.O.*, 92 F.4th at 1156.

14      A court reviews "whether the [district] has provided a FAPE de novo," but it accords

15  deference to the ALJ's factual findings where they are "thorough and careful." *M.C. by &*

16  *through M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 (9th Cir.

17  2017). Neither the hearing duration, nor the ALJ's active involvement, nor the length of

18  the ALJ's opinion is dispositive of an ALJ's thoroughness and care. *Id*. Instead, courts

19  "must actually examine the record to determine whether it supports the ALJ's opinion." *Id.*

20  at n.1. If, upon examination of the record, a court determines an "ALJ's decision does not

21  provide sufficient analysis to specific evidence to support his conclusions," then a court is

22  "unable to conduct the review as required by law." *Placentia-Yorba Linda Unified Sch.*

23  *Dist. v. K.F.*, No. SACV 24-00087-KK-DFMX, 2025 LX 138267, at *18 (C.D. Cal. Apr.

24  8, 2025). Under these circumstances, and because courts cannot "substitute their own

25  notions of sound educational policy for those of the school authorities," *Ojai*, 4 F.3d at

26  1471–72 (citations omitted), the district court may remand the matter for further

27

28

development. *See N.R. v. Del Mar Unified Sch. Dist.*, No. 21-cv-01759-AJB-KSC, 2023 WL 8532395, at *4 (S.D. Cal. Dec. 8, 2023) (collecting cases citing remand authority).

## III.    ANALYSIS

As set forth below, the Court concludes that the ALJ's analyses are based on factual findings that are inconsistent with the record. The Court therefore vacates the ALJ's Decision and remands the case for further proceedings.

### A.    The ALJ's Factfinding for District's Issues 1 and 2 Is Not Supported by the Record and Requires Remand

#### 1.  District's Issue 1: Legal Sufficiency of District's Psychoeducational Assessment

In his June 18, 2023 decision, the ALJ determined that the District's psychoeducational assessment and accompanying report were not legally sufficient because they "were incomplete, lacked suitable investigation and analysis, and failed to use adequate and appropriate means to gather information regarding [C.A.]" AR 1495. Specifically, the ALJ concluded there were six main deficiencies with the assessment and report. The District appeals this decision (District's Issue 1). As set forth below, the Court concludes the purported deficiencies identified by the ALJ are not sufficiently supported by the record.

##### a.    Failure to Modify Recommendations Based on Parent's Input About C.A.'s Mental Health History

As part of its psychoeducational assessment, the District sent Parent a "social emotional behavior questionnaire." AR 1481. In her response to the questionnaire, Parent described C.A.'s mental health history, including challenges she experienced during her eighth-grade year such as anxiety, suicidal ideation, attempted self-harm, and bullying. AR 1481–82. The ALJ found that despite amending her report to reflect Parent's input about C.A.'s mental health history, Ms. Ray failed to "modify her recommendations for [C.A.]" based on this information, rendering her assessment incomplete. AR 1482, 1495.

Here, the record does not support the ALJ's finding. First, during the hearing before the ALJ, Ms. Ray testified that she did modify her IEP recommendations based on the information Parent provided about C.A.'s mental health. AR 2068–70. While the first draft of her report did not include a recommendation for school-based mental health services ("ERMHS"), following Parent's input during the first IEP meeting, Ms. Ray "revised [her] recommendation and recommended to the team that they should consider adding ERMHS services." AR 2069; *compare* AR 763 (May 25, 2023 draft), *with* AR 1253 (September 8, 2023 draft).

During the hearing, Ms. Ray also described the additional goals and accommodations she added to C.A.'s IEP based on Parent's input about C.A.'s mental health at the IEP meetings. These included a goal to improve C.A.'s "self-concept" as measured by scores on scales evaluating "Sense of Inadequacy, Self-Esteem, and Self-Reliance," AR 2148–52, AR 0857; a goal to improve C.A.'s "anxiety management" as measured by scores on various scales ("the Conners 4 Anxious Thoughts scale, the BASC-3 Anxiety Scale, and the BYI-II Anxiety Inventory"), AR 2152–54, AR 0858; and an accommodation of "[e]ducationally related mental health services: individual counseling for 150 minutes yearly and group counseling for 150 minutes yearly," AR 2161, AR 0861. The updated recommendation and inclusion of these goals and accommodations in C.A.'s IEP undermine the ALJ's finding.

### b. *Improper Reporting of Results on the Autism Spectrum Rating Scales*

During her assessment of C.A. for autism, Ms. Ray administered the Autism Spectrum Rating Scales, Parent and Teacher ("ASRS"). AR 1339–41, 1486. Ms. Ray reported a composite score on the ASRS rather than accounting for each individual score calculated from the responses of Parent and two teachers. AR 2231. During the hearing, the ALJ questioned whether Ms. Ray was "taking off the peaks and valleys and just leveling out [elevated] results," AR 2231, and in his decision he concluded Ms. Ray used the

composite score to "minimize the significance of any scores above average on the assessment," AR 1487. Based on these findings, the ALJ concluded that the District "failed to use adequate and appropriate means to gather information regarding [C.A.]" AR 1495.

Here, however, the record does not support the ALJ's finding that reporting a composite score on the ASRS was improper. During the hearing, Ms. Ray testified that averaging the scores to generate a composite score is proper according to the "manuals" for the test and results in "the most reliable scores." AR 2103, 2231; *see* 34 C.F.R. § 300.304(c)(1)(v) (assessments must be "administered in accordance with any instructions provide by the producer of the assessments"). The ALJ's decision does not cite evidence contradicting the District's testimony, and C.A. did not cross-examine Ms. Ray regarding her interpretation of the results. AR 2241. Nor did C.A.'s expert challenge Ms. Ray's reporting methods; instead, C.A.'s expert testified that any differences between the results of the District's ASRS and C.A.'s expert's ASRS were expected "fluctuations" that "weren't anything that concerned [her]." AR 2290. These facts undermine the ALJ's conclusion that Ms. Ray's interpretation of the ASRS results impermissibly minimized Parent's responses.

### c.    *Inappropriate Dismissal of Parent's Reports on the Conners 4 Assessment*

As part of the psychoeducational assessment, the District administered the Conners Rating Scales – Fourth Edition ("Conners 4") to measure C.A.'s social, emotional, and behavioral profile. The Conners 4 assesses behaviors and feelings associated with "attention difficulties, . . . attention-deficit/hyperactivity disorder (ADHD), other emotional and behavioral difficulties, and executive functioning." AR 1244. Parent, C.A., and two of C.A.'s teachers responded to the Conners 4. AR 1244–45. The ALJ found that Ms. Ray "attributed [] Parent's very high ADHD index to Parent's observations at home and did not find them significant for that reason." AR 1489. He also found that Ms. Ray

1  "inappropriately dismissed Parent's reports regarding suicide as a vestige of an earlier

2  incident and did not find current concerns." AR 1489.

3        Here, the record does not support the ALJ's finding that Ms. Ray discounted Parent's

4  Conners 4 ADHD-related responses. AR 1489. Ms. Ray's report states that Parent's ratings

5  "indicate that parents see many characteristics of ADHD at home[,]" while the ratings of

6  C.A.'s teachers were in the average range. AR 1246. Ms. Ray then notes:

7            Based on teacher and self-report ratings, behaviors related to ADHD do
            not impact [Student] to a severe extent in the classroom. Based on
8            parent reports, behavior associated with ADHD are more prevalent at
            home. Such discrepancies on ADHD rating scales are common, and it
9            should be noted that medication can mitigate ADHD symptoms
            observed by classroom teachers.
10

11 AR 1246. Ms. Ray's explanation that medication mitigates C.A.'s ADHD symptoms at

12 school weighed in favor of Parent's observations and against the teachers' scores,

13 undermining the ALJ's conclusion that Ms. Ray discounted Parent's responses. Further, in

14 concluding that C.A.'s ADHD and anxiety symptoms "substantiate[d]" her qualification

15 for special education, Ms. Ray appears to have credited Parent's scores rather than to have

16 discounted them as insignificant. AR 1251; *see* AR 1489.

17        The ALJ's allegation that Ms. Ray dismissed Parent's report regarding suicide is

18 also unsupported by the record. AR 1489. While the ALJ did not include citations to the

19 record, the Court finds that language in the record that could be perceived as dismissive of

20 Parent's report about suicidal ideation in fact comes from the standardized answer Parent

21 selected when filling out the Conners 4 scale ("Just a little true"). AR 1246. In her

22 summary, Ms. Ray elaborated on Parent's survey response and explained that although

23 Parent "reported a history of self-harm and suicidal ideation . . . [Parent] and [C.A.] both

24 reported that there are no current concerns about suicidal ideation or behaviors." *Id*.

25 Contrary to dismissing Parent's response in her report, Ms. Ray wrote "critical items

26 require follow up" and later in the paragraph added "[C.A.] is receiving outpatient mental

27

28

                                          13

health services." *Id*. For the above reasons, Ms. Ray's report appears to reflect follow-up on the issue of C.A.'s past suicidal ideation, not dismissal of it.

### d.  Invalidation of Parent's BASC-3 Scores and Minimization of Impact of C.A.'s Anxiety, Executive Functioning, and ADHD

Another assessment the District administered to measure C.A.'s social, emotional, and behavioral profile is the Behavior Assessment System for Children – Third Edition ("BASC-3"). The BASC-3 assesses "social-emotional and behavioral functioning." AR 1246. The assessment has built-in validity measures to detect when its results should be interpreted with caution for various reasons, including when the examinee responds inconsistently throughout the survey. AR 1247. Regarding Parent's responses, Ms. Ray noted that, "[w]hile some variability is expected, there were enough instances of disparate ratings to trigger the validity flag…therefore, parent ratings should be interpreted with caution." AR 1247. Ms. Ray noted there were no validity concerns with the responses from teachers and C.A.

The ALJ found Ms. Ray "dismiss[ed] the entirety of Parent's scores" and did not "further analyze Parent's responses." AR 1490. By doing so, the ALJ concluded that Ms. Ray had "minimized the impact of [C.A.'s] anxiety, executive functioning and ADHD on [C.A.] and concluded that difficulties were not noticeable by teachers and were not causing observable impairment in [C.A.'s] academic performance or behavior." AR 1490.

The record does not support the ALJ's findings. The language in Ms. Ray's report does not reflect a dismissal of the entirety of Parent's scores; instead, it states, "parent ratings should be interpreted with caution." AR 1247.  And Ms. Ray did further analyze Parent's responses even though they had triggered validity warnings, as demonstrated by her incorporation of Parent's responses into her summary of the BASC-3 scores:

> [T]he parent form was clinically significant on the Anxiety, Attention Problems, Withdrawal, and Activities of Daily Living scales, as well as

the ADHD Probability and Functional Impairment Index composites. These overlap with [C.A.'s] at-risk scores on the Anxiety and Attention scales (the two scales with both at-risk ratings by [C.A.] and clinically significant parent ratings, although teacher ratings were average on these scales).

AR 1290. Ms. Ray also incorporated Parent's "clinically significant" ratings into her recommendation for C.A. to qualify for special education due to her ADHD. AR 1251. She made no further mention of validity issues with Parent's responses in the report, including in the recommendation section. *See* AR 1251. The record therefore undermines the ALJ's conclusion that Ms. Ray dismissed the entirety of Parent's responses.

### e.    *Failure to Administer a Replacement Test for Adaptive Behavior*

As part of its autism assessment, the District administered an adaptive behavior[5] assessment called the Vineland. AR 1341–42, 1486. The Vineland "is a standardized measure of adaptive behavior" that asks a parent, caregiver, or teacher to rate a child's daily activities. AR 1243. Ms. Ray deemed the Vineland invalid for C.A.'s assessment because there were too many questions for which the teacher and Parent could not give informed responses.[6] AR 1243–44. However, not all the "domains" on Parent's assessment were invalid; Ms. Ray reported "the scores on two of the domains on the Parent form,"

---

[5]    "Adaptive behavior" refers to behavior that children need "to function in their everyday lives," AR 1341, including how children "take[] care of personal needs at home, school and in the community," AR 0631. During the hearing, Ms. Ray explained that "looking at adaptive behavior is often helpful" when assessing a student for autism since "autism…would have a lot of effects on a student's daily functioning." AR 2105.

[6]    For example, C.A.'s world history teacher did not directly observe C.A. "being able to name all twelve months of the year in order" because that was not a task she had to perform in world history class.  AR 1244. Similarly, some of Parent's scores were deemed invalid because she too had to "guess" on topics of which she did not have firsthand knowledge, since they were related to C.A.'s behavior at school. *Id.*, AR 2107.

Daily Living Skills and Socialization. AR 2108, 1243. She interpreted these scores as demonstrating C.A. had "below average daily living skills and socialization." AR 1244. Although she invalidated the Vineland and recommended that the IEP team not rely on it, AR 1342, Ms. Ray did not administer a separate assessment to measure C.A.'s adaptive behavior skills. The ALJ concluded that "failing to use a different or replacement assessment for adaptive behavior resulted in insufficient standardized assessment information about [C.A.] with regard to adaptive behavior." AR 1488.

The ALJ found that the absence of an adaptive behavior standardized assessment rendered the psychoeducational assessment and report incomplete. AR 1495. However, the Decision did not address the sufficiency of the other sources of information Ms. Ray considered when assessing C.A.'s adaptive behavioral needs in an educational setting. AR 2108–09. Ms. Ray also reviewed qualitative feedback from the world history teacher whose Vineland scores were invalidated, AR 1244, as well as from Dr. Holly Reed, the former director of special education at Winston, AR 2109. According to Ms. Ray, Dr. Reed's "comments from within the school setting [were] that [C.A.'s] adaptive behavior skills were what they needed to be to navigate campus and everything, feed herself, use the restroom, and so forth." AR 2109. In addition to reviewing this staff feedback, Ms. Ray also reviewed previous IEPs and analyzed her behavioral observations of C.A. to support her conclusion that C.A. "demonstrates age-appropriate adaptive behavior skills at school." AR 1244. The ALJ did not appear to account for the entirety of the record in reaching his conclusion that "insufficient standardized assessment information" regarding adaptive behavior rendered the psychoeducational assessment legally deficient. AR 1488, 1495.

### f. Failure to Ask Follow-Up Questions or Inquire About Discrepancy Between Parent's and C.A.'s Responses

The ALJ found that Ms. Ray should have followed up with Parent regarding the information she shared about C.A.'s mental health history, including her past suicidal ideation, in the social emotional questionnaire referenced above. AR 1482. Additionally,

when in response to Ms. Ray's questions C.A. denied having had suicidal thoughts, the ALJ concluded that "such a contradictory response should have triggered further inquiry by Ms. Ray." *Id.* The ALJ found that an absence of Ms. Ray's follow-up in both instances rendered the assessment incomplete and legally deficient. AR 1495.

The record demonstrates Ms. Ray did discuss C.A.'s mental health history with Parent during the IEP meetings. For example, at the August 30, 2023 IEP meeting, Ms. Ray asked follow-up questions to better understand Parent's input regarding C.A.'s history of self-harm. AR 1090–92 ("[T]hank you for clarifying, [Parent]. Can you estimate just approximately because I do want it to be accurate and I didn't have this information when I was writing my report? Like approximately how many times do you think [C.A.] self-harmed?"); AR 1051 ("I did want to clarify the note that she left that was also around that same time, in the middle or part way through 8th grade, right?").

During the same IEP meeting, Ms. Ray acknowledged the discrepancy between Parent's and C.A.'s responses to her questions about C.A.'s history of suicidal ideation. She explained that C.A.'s denial did not concern her and was "pretty expected" because C.A. was "a ninth grade girl and [Ms. Ray was] an unfamiliar person." AR 1052. Further, in Ms. Ray's documentation of this discrepancy between Parent's and C.A.'s interview responses in her report, AR 1231, she credited Parent's account of C.A.'s mental health history, AR 1226, rather than C.A.'s, considering C.A.'s denial the one exception to her "reliability as a self-reporter," AR 1231.

The record of the discussion between Ms. Ray and Parent during the IEP meetings about C.A.'s mental health past, as well as Ms. Ray's explanation for why she was not concerned about the discrepancy between C.A.'s and Parent's responses, is inconsistent with the ALJ's factfinding.

//

//

//

17

24-cv-1653-RSH-JLB

### 2. District's Issue 2: Legal Sufficiency of District's Speech and Language Assessment

In his June 18, 2023 decision, the ALJ held the District's speech and language assessment and accompanying report were not legally sufficient because they "were incomplete, lacked suitable investigation and analysis, and failed to use adequate and appropriate means to gather information regarding [C.A.]." AR 1501. Specifically, the ALJ identified two main deficiencies with the assessment and report supporting his conclusion. The District appeals this decision (District's Issue 2). As set forth below, the Court concludes the purported deficiencies identified by the ALJ are not sufficiently supported by the record.

### a. The Assessment Was Not Thorough Because the OWLS-2 Exam Did Not Directly Measure "Pragmatics"

The District's speech and language pathologist, Melissa McNutt-Eidson, assessed C.A. for eligibility for special education services related to speech and language needs. AR 1291. These assessments were performed in response to District psychologist Ms. Ray's input that "there may be concerns with pragmatic language skills." AR 1291. Pragmatic language skills ("pragmatics") refers to "social language skills," including "awareness of the appropriateness of language and ability to modify language in relation to the situation in which it is used (e.g., knowledge of social context and cultural norms)." AR 1301. At one of the IEP meetings, Ms. McNutt-Eidson described C.A.'s pragmatic language skills as the area "that seems to be the primary area of concern that everybody . . . had for [C.A.]" regarding testing needs. AR 0975.

One of the two standardized assessments Ms. McNutt-Eidson administered was the Oral and Written Language Scales, Second Edition ("OWLS-2"), which measures listening comprehension and oral expression skills. AR 1300. C.A.'s scores on the OWLS-2 were all in the average range, AR 1300–02, and for each of the subtests the OWLS-2 test

comprised—including pragmatics—Ms. McNutt Eidson found C.A. displayed "no significant challenges," AR 1301.

The ALJ found Ms. McNutt-Eidson's assessment was legally deficient because she did not adequately assess C.A.'s pragmatics skill since the OWLS-2 "contain[ed] no direct measure and a minimum amount of information regarding a child's needs with regard to pragmatic language." AR 1499; *see* AR 1501.

Here, the record does not support the ALJ's finding. The OWLS-2 includes a "pragmatics" category with its own respective score. *See* AR 1301. In the report, Ms. McNutt-Eidson described C.A.'s results in this category:

> Pragmatic items included in the OWLS-II measure awareness of the appropriateness of language and ability to modify language in relation to the situation in which it is used (e.g., knowledge of social context and cultural norms). [C.A.] displayed no significant challenges within this category of linguistic structure. In the Listening Comprehension test she scored 3/3 (100%) and she scored 15/15 (100%) in the Oral Expression test section.

AR 1301. *See also* AR 1747 (Ms. McNutt-Eidson testified "the OWLS assessment looks at listening comprehension and oral expression and the usage of . . . pragmatics within those measures."); AR 1750–51 ("[S]he did really well on all the pragmatic language test questions. She scored 100%. So, again, overall, everything was in the average range.").

In the absence of an explanation of how the OWLS-2 pragmatics category differs from a direct measure of pragmatics, AR 1499, and in the absence of any citation to evidence explaining this difference, the Court determines the ALJ's conclusion is not supported by the record.

### b.    *Parent's and Dr. Reed's Concerns Were Not Reflected in the Assessment*

The ALJ concluded that the information Parent and Dr. Reed shared with the IEP team "barely registered in the speech and language assessment, and it was effectively

ignored in the assessor's evaluation of [C.A.'s] present levels or needs," rendering the assessment and evaluation legally deficient. AR 1501–02.

However, the record shows that Ms. McNutt-Edison did update her report to reflect Parent's and Dr. Reed's concerns. During the IEP meeting, in response to Parent's concern about the District overgeneralizing C.A.'s positive performance on the speech and language assessments, Ms. McNutt-Eidson told Parent, "I will note your comments in the parent section of this report." AR 0569. She then added the following information to the report:

> [During C.A.'s] IEP meeting, her mother [Parent] shared that although [C.A.] has improved in the last year she can have challenges with "blurting out" inappropriate comments. . . . Mom also shared that she has concerns for [C.A.'s] interactions within friend groups and sometimes her humor can be off putting or inappropriate. She shared sometimes [C.A.] can say hurtful or blunt things at home but that she has started to recognize that what she said was wrong and at times will apologize for the things she said. [Parent] also wanted to share that she wanted to make sure the team did not overgeneralize [C.A.'s] abilities based on test results taken from one test.

AR 1293–94. Ms. McNutt-Eidson also included a paragraph summarizing Dr. Reed's input. AR 1294. These additions to the report do not support the ALJ's conclusion that Parent's and Dr. Reed's input were not reflected in the assessment and evaluation.

**B.     Analyses of Student's Issues Require Remand Because They Were Based on Resolution of District's Issues 1 and 2**

Because the ALJ based his resolution of Student's Issues on the resolution of District's Issues 1 and 2, the Court remands Student's Issues as well. *See* AR 1502–03 (resolution of Student's Issues 1 and 3 based on District's Issue 1); AR 1504 (resolution of Student's Issue 2 based on District's Issue 1); AR 1505 (resolution of Student's Issue 4 based on District's Issue 2); AR 1509–10 (resolution of Student's Issue 5 based on District's Issue 1). Student's Issue 6 contains multiple discrete inquiries, including whether

Winston (or the District's placement) is the least restrictive environment in compliance with the IDEA, *see* 20 U.S.C. § 1412(a)(5)(A), and whether Winston qualifies as an "appropriate placement" for purposes of tuition reimbursement, *see* 34 C.F.R. § 300.148(c). However, the factfinding underlying District's Issues 1 and 2 bears on the resolution of these sub-issues as well.

## IV.   CONCLUSION

For the reasons set forth above, the Court **VACATES** the ALJ's decision and **REMANDS** the case for further proceedings with respect to all issues.

**IT IS SO ORDERED.**

Dated: October 22, 2025

_____
Hon. Robert S. Huie
United States District Judge